*Emile H. Ruch*, for plaintiffs.
*Michael Pedro*, for defendants.

OPINION OF THE COURT TO THE GOVERNOR IN THE MATTER
OF THE CONSTITUTIONAL CONVENTION.

APRIL 1, 1935.

58

*To His Excellency, Theodore Francis Green, Governor of the State of Rhode Island and Providence Plantations:*

We have received from Your Excellency a request for our written opinion upon a question of law in accordance with the following section of Article XII of amendments to the constitution of this state: "Sec. 2. The judges of the supreme court shall give their written opinion upon any question of law whenever requested by the governor or by either house of the general assembly." The question is as follows:

"Would it be a valid exercise of the legislative power if the General Assembly should provide by law,

(a) for a convention to be called to revise or amend the constitution of the state;

(b) that the governor shall call for the election, at a date to be fixed by him, of delegates to such convention in such number and manner as the General Assembly shall determine;

(c) that the general officers of the state shall by virtue of their offices be members of such convention;

(d) for the organization and conduct of such convention;

(e) for the submission to the people, for their ratification and adoption, of any constitution or amendments proposed by such convention; and

    (f)  for declaring the result and effect of the vote of a majority of the electors voting upon the question of such ratification and adoption?''

If this language were strictly and literally construed, it would require us to give a negative answer to the question, unless we should be of the opinion that it would be a valid exercise of its legislative power for the general assembly to pass an act or resolution which would contain provisions for all the different matters which are set forth in subparagraphs (a) to (f), inclusive, of the question. For obvious reasons we do not believe that the question was intended to be so construed.

Therefore, to carry out what we believe to be the real intent and purpose of the question, we construe it as comprising six questions, the first of which is whether it would be a valid exercise of the power of the general assembly, if it should provide, by an act or resolution, for the calling of a convention to revise or amend the constitution of the state. All of the other questions are only subsidiary and have no meaning, unless this first and primary question is answered in the affirmative. Assuming that it is so answered, each of the other questions is whether such an act or resolution of the general assembly could legally contain such a provision as is set forth in (b), (c), (d), (e), or (f) as the case may be.

These questions raise an issue that has long troubled the people of our state. That issue simply put is whether Article XIII of our constitution prescribes an exclusive method of altering the constitution either in part or as a whole. If it does, then a legal constitutional convention is an impossibility in Rhode Island. The judges of this court in an opinion submitted to the Honorable Senate forty-two years ago, *In Re The Constitutional Convention*, 14 R. I. 649, (March 30, 1883), said that it did. Since that time there has been no further judicial expression on the point in this state. Almost from the day it was given, however, that

opinion has been subjected to vigorous attack by authorities on the law of constitutional conventions both within and without the state. No court anywhere in the country when called upon to consider a similar constitutional question has cited it for authority.

In view of the foregoing, we have deemed it of the utmost importance in our consideration of the questions before us to exhaust every avenue of information that would assist us in giving our opinion. Accordingly we have largely laid aside other duties pressing upon us and have devoted ourselves to a thorough, painstaking examination of the authorities and a careful review of the legislative precedents and practice of Rhode Island in the field of constitution-making. In this we have been ably assisted by outstanding leaders of our bar, including the attorney general of the state, who at our invitation appeared before us and argued these intricate constitutional questions. In addition we have had also the benefit of their well-prepared and exhaustive briefs in the matter. We have carefully considered all the arguments presented and have examined and carefully considered all of the authorities to which our attention has been called and many others.

The first and primary question to be considered, then, is whether it would be a valid exercise of the power of the general assembly, if it should provide by law for the calling of a constitutional convention to revise or amend the constitution of the state. In dealing with this question, consideration should be given first to the pertinent parts of our constitution.

## ARTICLE I.

*Declaration of Certain Constitutional Rights and Principles.*

In order effectually to secure the religious and political freedom established by our venerated ancestors, and to preserve the same for our posterity, we do declare that the essential and unquestionable rights and principles hereafter mentioned shall be established, maintained, and preserved,

and shall be of paramount obligation in all legislative, judicial, and executive proceedings.

Section 1. In the words of the Father of his Country, we declare that "the basis of our political systems is the right of the people to make and alter their constitutions of government; but that the constitution which at any time exists, till changed by an explicit and authentic act of the whole people, is sacredly obligatory upon all."

## ARTICLE IV.

### Of the Legislative Power.

Section 1. This constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void. The general assembly shall pass all laws necessary to carry this constitution into effect.

Sec. 10. The general assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution.

## ARTICLE XIII.

### Of Amendments.

The general assembly may propose amendments to this constitution by the votes of a majority of all the members elected to each house. Such propositions for amendment shall be published in the newspapers, and printed copies of them shall be sent by the secretary of state, with the names of all the members who shall have voted thereon, with the yeas and nays, to all the town and city clerks in the state. The said propositions shall be, by said clerks, inserted in the warrants or notices by them issued, for warning the next annual town and ward meetings in April, and the clerks shall read said propositions to the electors when thus assembled, with the names of all the representatives and senators who shall have voted thereon, with the yeas and nays, before the election of senators and representatives shall be had. If a majority of all the members elected to

each house, at said annual meeting, shall approve any proposition thus made, the same shall be published and submitted to the electors in the mode provided in the act of approval; and if then approved by three-fifths of the electors of the state present and voting thereon in town and ward meetings, it shall become a part of the constitution of the state.

The constitution contains no mention of a constitutional convention or of any method of constitutional change except as above set forth. The title given in the constitution to Article I, namely, "Declaration of Certain Constitutional Rights and Principles," shows that the right which is set forth in the first section is a *constitutional* and not a revolutionary right. It states in substance and effect that one of the fundamental rights, which, as the preamble of this article says, "shall be established, maintained, and preserved, and shall be of paramount obligation in all legislative, judicial, and executive proceedings," is the right of the people "to make and alter their constitutions of government" by any "explicit and authentic act of the whole people." It is a recognized principle of free institutions that the normal and regular way for the people to act on any matter submitted to them, unless some other way is clearly and validly prescribed, is by the votes of a majority of the duly qualified electors who vote on such matters, such votes then constituting an "act of the whole people."

According to the language of the section in question such an act, to have the effect of making or altering a constitution must be "an explicit and authentic act," that is, it must be clearly and definitely expressed by votes which are cast and counted and the result of which is determined, all according to law. The second sentence of section 1 of Article IV, above quoted is "The general assembly shall pass all laws necessary to carry this constitution into effect." Taken alone this might reasonably mean that the general assembly shall pass all laws necessary to put the constitution into operation and to provide for the transition from government

under the charter to government under the constitution. But these matters are well provided for by the constitution itself in section 1 of Article XIV, which provides when the constitution shall go into operation, if adopted, and how the first elections under it shall be held and for the transition from the old government to the new.

If the sentence in question were intended to apply only to the transition period, it would naturally be placed in Article XIV, which deals with that subject. Instead of being so placed, it follows immediately after the sentence "This constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void." This evidently applies to the whole period during which the constitution shall be in operation and says that the general assembly cannot validly pass any laws which are inconsistent with the constitution. The most natural conclusion is that the sentence which follows, namely, "The general assembly shall pass all laws necessary to carry this constitution into effect" was intended to cover the same period and to make it the duty of the general assembly, not only to refrain from passing any law which is contrary to the constitution, as provided in the first sentence, but also to pass all laws which shall be necessary from time to time to make effective at all times the provisions of the constitution, including those in Article I, the "Bill of Rights." For these reasons it is our opinion after careful consideration that it is the duty of the general assembly to pass whatever laws may be needed, at any time or from time to time, to enable the people by an explicit and authentic act to make a new constitution or to alter the present one.

The method of doing this, which had been recognized as the regular and ordinary method and which had been used before 1843 by many states, when there was no provision for it in their constitutions, was first, by the holding of a convention under a legislative enactment, second, by the framing of a new constitution or the revision of the existing one and third, by the adoption of such new constitution or

revision by the people at an election provided for by law. It is also well settled that no other method can be legally employed for amending or revising a constitution or substituting another one for it, unless such other method is expressly provided for in the constitution itself.

The above procedure has also been followed a great many times since 1842 in most of our states, without any provisions for it in the constitutions which were in effect in those states when the conventions were called. Changes thus made have always been recognized as regular and legal and not revolutionary by all the text writers on the subject of constitutional law and by all the courts which have dealt with such changes, leaving out of consideration for the present two advisory opinions, *Opinion of the Justices*, 6 Cush. 573, and *In Re The Constitutional Convention, supra*, which will be fully discussed later in this opinion.

The regularity and legality of this method, in the absence of any provision for it in a constitution, has perhaps never been better stated than by Daniel Webster in his argument before the supreme court of the United States in the Rhode Island case of *Luther* v. *Borden*. 7 How. 1, (1848).

The following quotations from this argument are found in "Works of Daniel Webster," VI, 227-229. After speaking of the established American doctrine of popular sovereignty he said: "Another American principle growing out of this, and just as important and well settled as is the truth that the people are the source of power, is that, when in the course of events it becomes necessary to ascertain the will of the people on a new exigency, or a new state of things or of opinion, the legislative power provides for that ascertainment by an ordinary act of legislation. . . . It is enough to say that, of the old thirteen states, the constitutions, with but one exception, contained no provision for their own amendment. . . . Yet there is hardly one that has not altered its Constitution, and it has been done by conventions called by the legislature, as an ordinary exercise of legislative power.

"One of the most recent laws for taking the will of the people in any State is the law of 1845, of the State of New York. It begins by recommending to the people to assemble in their several election districts, and proceed to vote for delegates to a convention. If you will take the pains to read that act, it will be seen that New York regarded it as an ordinary exercise of legislative power. . . . We see, therefore, from the commencement of the government under which we live, down to this late Act of the State of New York, one uniform current of law, of precedent, and of practice, all going to establish the point that changes in government are to be brought about by the will of the people, assembled under such legislative provisions as may be necessary to ascertain that will, truly and authentically."

The 1821 constitution of New York, in effect when this act was passed, contained no provision for calling a constitutional convention and no declaration of popular rights on the subject and did contain a provision (Art. 8) for its amendment by legislative proposal, in substantially the same way as provided in the constitution of Rhode Island.

Before 1842 there had been for more than twenty years great agitation and discussion of the matter of the framing and adopting of a constitution, and the general assembly had responded by calling conventions for the purpose in 1824, 1834, 1841 and 1842, the last one of which framed our present constitution adopted in 1842. When the convention placed in that constitution the statement that the people of Rhode Island had an unquestionable right to make and alter their constitution, it had in mind the manner in which this first constitution was made and it intended to reserve that right to the people for all time. This was the construction placed upon this language by the general assembly eleven years later in 1853, when they invited the people to elect delegates to a convention. There was no question raised at that time of the right of the people to do so upon such invitation. All these events must be considered in construing the provisions of the present

constitution which are pertinent to the question now under discussion.

The next of these provisions now to be discussed is the above quoted section 10 of Article IV, "The general assembly shall continue to exercise the powers they have heretofore exercised; unless prohibited in this constitution." It is our opinion, in view of these legislative precedents up to and including 1842, that under this language the general assembly, unless prohibited elsewhere in the constitution, has the constitutional power to pass a law providing for the calling and holding of a convention to revise the existing constitution or to frame a new one.

Can we say that this otherwise clear and undoubted power in our general assembly, which it had so frequently exercised under the charter, is non-existent because the exercise of it is elsewhere prohibited in the constitution? The word "prohibited" is a strong word and in our judgment is not satisfied by anything short of a prohibition that is clearly, definitely and necessarily implied, even if it does not require that the prohibition be express. Moreover, these facts, above stated, should be kept in mind, that section 1 of Article I of the constitution states the fundamental right of the people "to make and alter their constitutions of government," with the sole limitation that this must be done "by an explicit and authentic act of the whole people;" that the normal, regular, and legal method of exercising that right, unless excluded by the constitution, has always been held, in all states and by all authorities, to be by the action of a convention chosen by the electors and the approval of that action by the votes of a majority of the electors who vote thereon, all under a law or laws passed by the legislature; that the right of the people "to make and alter their constitutions of government . . . by an explicit and authentic act" is one of the rights which by the preamble to Article I "shall be established, maintained, and preserved, and shall be of paramount obligation in all legislative, judicial, and executive proceedings;" and that

by section 1 of Article IV it is the duty of the general assembly to pass all laws necessary to make this right effective.

These facts strongly support our conclusion that the exercise by our general assembly of its previously exercised right to provide by law for calling a constitutional convention cannot properly be held to be prohibited by anything short of a prohibition that is clearly, definitely and necessarily implied, so as to be substantially equivalent to an express prohibition.

There is in our constitution no express prohibition of the exercise by the general assembly of a power to provide for a constitutional convention, and the only part of it which has ever been relied upon as impliedly prohibiting the exercise of such a power is Article XIII, above quoted, which provides that the general assembly *may* propose amendments to this constitution by following a certain *required procedure* and that such proposals, thus made, may be ratified by three-fifths of the electors voting thereon. One power which a legislature has cannot properly be held to be impliedly prohibited by the grant to it of another power, unless the two powers are inconsistent with each other. There is no inconsistency whatever between the power of a legislature to provide for calling a convention, to be chosen by the people, for revising a constitution or drafting a new one, and to provide that a revision or new constitution so made shall be submitted to the people and become operative, if adopted by a majority vote, and another power in the legislature, by following a prescribed procedure, to propose directly to the people an amendment or amendments of the existing constitution. The two powers are suitable for different purposes, the former to a general revision of a constitution or the making of a new one, the latter to the making of a special and particular amendment or a few of them, where the matter is relatively simple. That they are not inconsistent is shown by the fact that very frequently both powers have been provided for in the same constitution. With both powers the main

sanction is the vote of the people, but with the former the matter voted on by the people is framed by a convention, the members of which are specially chosen by the people for that purpose only and assigned to that one task, and the only function of the general assembly is to provide for this to be done; with the latter the matter voted on by the people is framed by the general assembly whose chief function is to perform general legislative duties. For these reasons we are convinced that the exercise of the former power by the general assembly is not prohibited by Article XIII, which merely permits and regulates the exercise of the latter power.

Yet the judges of this court in 1883 in their opinion entitled *In Re The Constitutional Convention, supra,* advised the senate that the exercise of any power by the general assembly to make any provision by law with regard to a constitutional convention was impliedly prohibited by Article XIII, which in their judgment was an exclusive provision for amending the constitution; that "the mode provided in the constitution for the amendment thereof is the only mode in which it can be constitutionally amended."

We do not feel bound to follow that opinion. While it is entitled to respect, and we have given it careful attention, it is not a decision of this court and therefore can have no weight as a precedent.

In the litigated case of *Taylor* v. *Place,* 4 R. I. 324, at page 362, (1856), AMES, C. J. said: "The advice, or opinion, given . . . to the governor, or to either house of the general assembly, under the third section of the tenth article of the constitution, is not a decision of this court; and given, as it must be, without the aid which the court derives, in adversary cases, from able and experienced counsel, though it may afford much light, from the reasonings or research displayed in it, can have no weight as a precedent." This court has since uniformly so regarded its advisory opinions. *Allen* v. *Danielson,* 15 R. I. 480, (1887); *In Re Election of United States Senators,* 41 R. I. 209, (1918); *Opinion to the Senate,* 51 R. I. 322, (1931).

In applying this rule stated by AMES, C. J., *supra*, to the above mentioned opinion in 14 R. I., it should first be noticed that the opinion itself shows that the resolution of the senate for submitting the questions to the judges was adopted March 20, 1883, and was received by them on March 24, and that their opinion was delivered six days later. Evidently they had no assistance from counsel. The last sentence of the opinion is as follows: "The questions are extremely important, and we should have been glad of an opportunity to give them a more careful study, but under the request of the Senate for our opinion, 'without any unnecessary delay,' we have thought it to be our duty to return our opinion as soon as we could, without neglecting other duties, prepare it."

In a pamphlet entitled "Some Thoughts on the Constitution of Rhode Island" and published in 1884, DURFEE, C. J., one of the judges, said that during the six days they "were holding court all the while" and that the question was not novel to him, though he "had not given it any special study." The whole opinion indicates that it was ill-considered and hastily prepared. It is not only not binding on us as a precedent, but is also entitled to little or no weight, in spite of the ability and character of the men who joined in it.

For the conclusion arrived at by the judges, viz., "that the mode provided in the constitution for the amendment thereof is the only mode in which it can be constitutionally amended," the only reason of a legal nature given in the opinion is that the maxim "*expressio unius est exclusio alterius*" requires this conclusion. The opinion must stand or fall according as that reason is sound or unsound. In the first place, we are convinced that the judges misunderstood the maxim and its proper application. It does not mean, where two powers are not inconsistent, that the granting or affirmance of one of them is a prohibition of the exercise of the other.

We agree fully with what the New York court of appeals said in *Barto* v. *Himrod*, 8 N. Y. 483, in which the question was whether the legislature could enact a law subject to the approval of a popular vote. "And I do not mean to lay much stress upon the implication arising from the express provision to submit a law creating a debt to the people, and the silence of the constitution in relation to submitting to the people other matters of legislation. The maxim '*Expressio unius est exclusio alterius*' is more applicable to deeds and contracts than to a constitution, and requires great caution in its application, in all cases."

The question now under consideration relates even more to the fundamental right of the sovereign people to alter their constitution than to the power of the general assembly and we agree fully with what Judge BRADLEY, a former chief justice of this court, at page 26 of the pamphlet published by him entitled "The Methods of Changing the Constitution of the States, especially that of Rhode Island," (1885), said with reference to this maxim: "Any legislation which is to affect the sovereign power should not leave the right to mere inference. It should be direct, especially in constitutions addressed to the popular mind and adopted by it; a great sovereign right should not be left to legal conjecture and implication. The people, in such proceedings, say what they mean. They do not leave a negation of one power to be inferred from the grant of another." Dwarris on Statutes, 712.

All the pertinent provisions of our constitution should be considered in deciding the question whether the previously exercised power of the general assembly to call a constitutional convention is prohibited by Article XIII. The proper reasoning to be applied to that question and the proper answer to it cannot in our judgment be better stated than they were at page 30 of that pamphlet, where, after stating the declarations in the preamble and section 1 of Article I of the constitution, Judge BRADLEY said of the right to hold a convention: "This provision of our con-

stitution is conclusive as to the existence of the right. It is not referred to in these denials of the right. There is another provision of the constitution which grants the power in question. Under the charter government, the General Assembly possessed all powers. Many of the people of the State preferred this patriarchal government to the division of powers systematically arranged in the usual State constitution. They yielded reluctantly to the pressure and persuasion of enemies and friends. While granting a constitution, they yet incorporate in it the provision that the General Assembly shall continue to exercise the powers they have hitherto exercised unless prohibited by the constitution. Among these powers was that of calling a constitutional convention. Had they meant to have excluded that power, they would have said so. The mere permission to the Assembly to propose amendments does not prohibit the other power. . . . It certainly cannot be claimed that the amendatory power given to the General Assembly cannot operate or exist while the reforming power over their constitution by the people, through a convention and act of Assembly, also exists. The coexistence of these powers has been manifested in terms and in action under nearly fifty State constitutions in this country."

The judges of this court in their advisory opinion on this question say that "as was clearly shown in *Taylor* v. *Place*, *supra*, an implied is as effectual as an express prohibition." But what was decided in that case, in the famous opinion by AMES, C. J., was that the exercise by the general assembly of the judicial power previously exercised by it is prohibited by section 1 of Article X of the constitution. "The judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time ordain and establish." The court properly held (pp. 355-359) that this is equivalent to saying that *all* the judicial power of the state shall be so vested and gives *exclusive* judicial power to the courts, and that

this necessarily excludes the existence of judicial power in any other department of the government. The court says on page 359 that "the implication is unavoidable and equivalent to an express and explicit prohibition."

The judges, near the beginning of the advisory opinion say, "The ordinary rule is that where power is given to do a thing in a particular way, there the affirmative words, marking out the particular way, prohibit all other ways by implication, so that the particular way is the only way in which the power can be legally executed." This way of stating the rule does not show its limitations or its true basis, which is that affirmative words may properly be construed as operating negatively also, if, unless they are so construed, they will have no effective operation at all. The limitations and true basis of the rule are well brought out in *North Stafford Steel &c. Co.* v. *Ward*, L. R. 3 Exch. 173 (1868), one of the four authorities cited by our judges in support of their statement of the rule. There the articles of association of a company provided that in case all its shares of stock were not subscribed for, it could, if the directors should by resolution so declare, carry on its business as a company from that time just as if its shares were all subscribed for. It was held that the company could not begin doing business until either its shares were all subscribed for or such resolution had been passed. The court properly said that unless the language was construed as having that effect it was meaningless. Neither this nor any of the other three authorities cited by our judges as supporting the rule as they state it seems to us to give any support to their application of such rule.

The rule has been properly applied in cases to be discussed *infra*, which have held that if a legislature is given by a constitution the power to propose directly to the people amendments to the constitution, and the method of doing this is stated, that power cannot be legally exercised by any other method. What our judges did was to conclude in effect that, under the rule which they stated, the grant of

power to the general assembly by Article XIII to frame and propose amendments, by a certain method, prohibited the general assembly from exercising a power which it had *independently* of that grant and which was a *different but not an inconsistent* power, namely, the power to provide by law for the calling of a convention to frame a new constitution or a revision of the existing one and propose it to the people for adoption or rejection. We believe that no support can be found for that conclusion.

The power granted to the general assembly by Article XIII can naturally and reasonably be viewed as an *additional* rather than an exclusive power and the recognized rule is that if two constructions of a constitutional provision are reasonably possible, one of which would diminish or restrict a fundamental right of the people and the other of which would not do so, the latter must be adopted. Yet our judges, by a highly technical course of reasoning, reached the conclusion that the people, by adopting a provision which permitted the general assembly to propose amendments to them directly in a specified manner, had divested themselves completely of their fundamental right to revise their constitution or to make a new one by the regular and normal method of a convention, chosen by themselves for that purpose; and that this was so because they had thus impliedly prohibited the general assembly from passing the measures necessary for the legal exercise of that right.

Our judges in their opinion said: "One of the greatest of modern jurists, Chief Justice SHAW, was of the same way of thinking, and conjointly with his associates, declared it to be his opinion that the Constitution of Massachusetts is constitutionally amendable only as therein provided." *Opinion of the Justices*, 6 Cush. 573. It should be noticed that our judges interpreted the word "amendment" as including revision and the substitution of a new constitution, which, they said, could only differ from the existing one "in superstructure and detail" and would be a new constitution only in name. We are convinced that they were

mistaken in this view and that there is a real distinction between "an amendment or amendments," as used in constitutions, and a revision or a new constitution, though it may be difficult in some cases to draw a clear line of demarcation between them. A careful consideration of the brief opinion written by Chief Justice SHAW convinces us that he had this distinction very clearly and definitely in mind and that he very carefully refrained from expressing any opinion upon the question whether the provision which was in the existing constitution of his state and which was substantially like our own Article XIII prohibited the legislature from calling a constitutional convention or submitting to the people the matter of calling such a convention, for the purpose of revising the constitution or drafting a new one. In fact no such question was submitted to the judges of his court.

The second question which the Massachusetts judges were asked to answer and which they answered first was as follows: "Can any specific and particular amendment or amendments to the Constitution be made in any other manner than that prescribed in the ninth article of the amendments adopted in 1820?" The answer which they gave to this question was "that, *under and pursuant to the existing Constitution*, there is no authority given by any reasonable construction or necessary implication, by which any specific and particular amendment or amendments of the Constitution can be made, in any other manner than that prescribed in the ninth article of the amendments adopted in 1820." This was a perfectly correct answer, but it gave no support to the opinion of our judges in 1883.

Presumably what our judges were relying upon, and the only part of the Massachusetts opinion which they, even upon hasty reading, might have construed as supporting their view was the next sentence of that opinion, as follows: "Considering that previous to 1820 no mode was provided by the Constitution for its own amendment, that no other power for that purpose, than in the mode alluded to, is

anywhere given in the Constitution, by implication or otherwise, and that the mode thereby provided appears manifestly to have been carefully considered, and the power of altering the constitution thereby conferred to have been cautiously restrained and guarded, we think a strong implication arises against the existence of any other power, *under the Constitution*, for the same purposes." (underscoring ours)

In view of the fact that in the immediately preceding sentence the judges were clearly discussing only "any specific and particular amendment or amendments" it is reasonable to infer that the judges in the latter sentence were still considering only such amendment or amendments, "for the same purpose" meaning "for the purpose of making any specific and particular amendment or amendments." This is the only construction of their language which would make it responsive to the question which they were answering. But, be that as it may, the words underscored by us in the two quotations show clearly that the judges were only dealing with the matter of powers recognized as existing, *by the constitution*. That they were only dealing with that matter is also made perfectly clear by the very beginning of their opinion, in which they say: "The court do not understand that it was the intention of the House of Representatives to request their opinion upon the natural right of the people in cases of great emergency, or upon the obvious failure of their existing Constitution to accomplish the objects for which it was designed, to provide for the amendment or alteration of their fundamental laws; nor what would be the effect of any change and alteration of their Constitution, made under such circumstances and sanctioned by the assent of the people. Such a view of the subject would involve the general question of natural rights, and the inherent and fundamental principles upon which civil society is founded, rather than any question upon the nature, construction, or operation of the existing Constitution of the Commonwealth, and the laws made

under it. We presume, therefore, that the opinion requested applies to the existing Constitution and laws of the Commonwealth, and the rights and powers derived from and under them. Considering the questions in this light, we are of opinion," *etc.* In this connection it should be kept in mind that the Massachusetts constitution under which these judges were then sitting contained an express assertion of the right of the people "to institute government; and to reform, alter or totally change the same, when their protection, safety, prosperity and happiness require it." It is strange that the judges did not quote this language of the constitution instead of describing the right of the people as a natural right exercisable "in cases of great emergency, or upon the obvious failure of their existing constitution to accomplish the objects for which it was designed." However, they nowhere suggest that the exercise of this right would be revolutionary, if carried out by the usual and normal convention method with the concurrence of the legislature as the natural agency of the people for facilitating the exercise of that power.

In view of what we have said above as to the Massachusetts opinion and of the fact that the constitution which then existed in that state did not contain any such clause as section 10 of Article IV of our constitution, we are fully convinced that the Massachusetts opinion does not support in the slightest degree the opinion of our judges.

Our views, above stated, as to the true meaning and effect of the Massachusetts opinion is in accordance with the views of all the text writers who to our knowledge have discussed it. Judge JAMESON in "Constitutional Conventions," § 574, says with reference to the opinion of our judges: "As to the weight to be accorded this opinion, we will only now observe, that so far as it is based upon that of the Massachusetts judges, it is wholly without force, because the two cases are very dissimilar in their facts, insomuch that, while it is possible to approve the opinion of the Massachusetts judges, it does not follow, according

to the principles propounded in it, that that of the Rhode Island judges is to be approved. In the Massachusetts case, where the Constitution had provided a mode in which 'specific and particular amendments' might be made through the agency of the legislature, the question put to the judges was whether 'any specific and particular amendment or amendments' could be made in any other manner than that provided in the Constitution. To this question the answer ought, according to the principles announced by both courts, to have been in the negative, since it inquired as to the lawfulness of doing the same thing in a different way from that prescribed by the Constitution. But that opinion could not properly be cited as authority in the Rhode Island case, where the question was whether, if a Convention were called 'to frame a new Constitution of the State,' and it were adopted by the people, it would be valid, the existing Constitution having provided a mode in which amendments thereof might be made, but not having authorized the call of a Convention? Here, as we shall see in a subsequent section, the proposition was to do a different thing, that is, to frame a new Constitution, in a different way, and therefore according to all authorities the maxim could have no application: in other words, because the people could not do *the same* thing in a different way, it does not follow that they could not do a *different* thing in a different way."

Holcombe, on "State Government in the United States," at page 97 of the revised edition, also says with reference to the opinion of our judges: "It was contended that there was precedent for this opinion in an earlier opinion of the supreme court of Massachusetts. A careful study of the opinion of the Massachusetts court, however, shows that its opinion related to another matter. In no state has the opinion of the Rhode Island court been followed." To the same general effect are Dodd on "The Revision and Amendment of State Constitutions", p. 45, and Hoar on "Constitutional Conventions," pp. 46, 47.

The legislature of Massachusetts in 1852, when no emergency existed, submitted to the voters the question of holding a constitutional convention, the question was answered affirmatively; and the convention was held in 1853. Our views as to the Massachusetts opinion are in accord with the views and actions of the members of that convention, which sat under the sanction of the legislature and the people to revise the very same constitution involved in that opinion. Marcus Morton, one of the four judges who gave the opinion, sat as a delegate in that convention, as did also Joel Parker, former Chief Justice of New Hampshire, and both expressed the opinion that the convention was legal. That view seems to have been universally accepted. See Jameson, *supra*, § 574 a.

This convention was not mentioned by our judges in their opinion nor were any of a number of other conventions which had been held under constitutions that contained provisions for their amendment by the method of legislative proposal and no provisions for constitutional conventions. They failed also to cite a number of previous cases in other states which supported the legality of conventions similarly held. Besides the Massachusetts and New York conventions above discussed, conventions were held before 1883 in the following states, which at the time had constitutions containing provisions for amendments in the legislative proposal mode, but none with regard to conventions: Arkansas, 1874; Louisiana, 1852, 1879; Missouri, 1845, 1861, and 1865; New Jersey, 1844; Pennsylvania, 1872; Tennessee, 1870; Texas, 1875; See Jameson, 210, § 219, note 1; 560, § 537 a, note 2; 601, § 570 and note 1; and Appendix B., pp. 643–655. So far as we have been able to ascertain, the validity of any of these conventions has never been questioned by any text writer or in any cases except a few in which it has been sustained. Many other conventions have been held since 1883 under similar conditions. These were all recognized as valid and some of them have been judicially sustained, as will be shown *infra*.

Briefs submitted to us in support of the opinion of our judges in 1883 cite two Rhode Island cases as supporting their position. One of these cases is *State* v. *Kane*, 15 R. I. 395, (1886), decided by the same judges except that Judge WILBUR had replaced Judge CARPENTER. At that time the fifth amendment to our constitution provided: "The manufacture and sale of intoxicating liquors to be used as a beverage shall be prohibited. The general assembly shall provide by law for carrying this article into effect." Parenthetically, it should be noticed how closely the language of the second of the two sentences quoted parallels the language of the second sentence of section 1 of Article IV of our constitution, "The general assembly shall pass all laws necessary to carry this constitution into effect." It is obvious that in the amendment the sentence means that the general assembly shall pass all laws necessary at any time or from time to time to enforce the amendment; and this supports the view, set forth near the beginning of this present opinion, that the corresponding sentence in Article 1V should be interpreted in the same way.

The statute involved in the case prohibited the sale of intoxicating liquors for beverage purposes and for certain other purposes The defendant argued that the inclusion in the prohibitory statute of the sale of intoxicating liquors for these other purposes made the statute repugnant to the amendment, which only required the general assembly to prohibit the sale of intoxicating liquors for beverage purposes. With reference to this argument the court, at page 397, says: "The defendant's argument rests upon the legal maxim, *expressio unius est exclusio alterius*, which, literally translated, signifies, the expression of one is the exclusion of the other. The maxim is often applied in construing written instruments, particularly grants, to narrow their scope to what is expressed in them, by the exclusion of what, but for the expression, would be implied. Thus, if a lot, with no access to it save over the grantor's land, be conveyed with the express grant of a particular

way, any way which might otherwise be implied will be excluded." This language certainly does not support the advisory opinion of 1883.

A little farther along on the same page the court, in showing that the maxim did not apply to the case, said: "We can see nothing in the first clause of the fifth amendment which warrants such an implication. The second clause is a command to the General Assembly to provide by law for carrying the first clause into effect. Of course, if the General Assembly had previously had no power to legislate on the subject, this command would confer by implication the power required for its own execution. But the General Assembly had power, before the amendment, not only to prohibit the sale of intoxicating liquors as a beverage, but also to restrict and regulate their sale for other purposes. The two powers, if they may be called two, are not inconsistent. Why, then, should an express command to exercise the one be tantamount to an abrogation of the other? We see no reason why it should. This view is not in conflict with the opinion of the judges *In Re The Constitutional Convention*, 14 R. I. 649. There was in that matter no command to the General Assembly to prohibit the doing of a thing for a particular purpose, but a command to the General Assembly to proceed in a particular manner in amending the Constitution, if it proceeded at all. The distinction is this: That it is entirely feasible to prohibit the doing of a thing for one purpose, and at the same time to prohibit or restrict, or to refrain from prohibiting or restricting, the doing of it for other purposes; whereas it is impossible to make an amendment to the Constitution in the manner prescribed, and at the same time to make it in a different manner. Our conclusion is that the amendment has no effect beyond what is expressed and what may be implied to carry out what is expressed in it, and consequently that the General Assembly still has all the powers, not inconsistent with the amendment so construed, which it previously had." The court in this

quotation correctly states a limitation to the proper application of the maxim, saying in substance, that a power which would otherwise exist in a legislature to do one thing is not taken away by a constitutional command to exercise in a certain way another power to do a different thing, the two powers not being inconsistent with each other. But in our judgment it fails utterly in its labored efforts to reconcile its advisory opinion of three years before with this statement of the limitation to the proper application of the maxim. In trying to do this it first begs the whole question in saying that in the matter previously before it there was "a command to the General Assembly to proceed in a particular manner in . amending the Constitution, if it proceeded at all," whereas in fact Article XIII only *permitted* the general assembly to propose to the people an amendment to the constitution and then *commanded* it to follow a certain procedure in doing this, if. the general assembly chose to initiate a constitutional change *in that way;* and the general assembly admittedly had another power to do a different thing, (namely, to initiate proceedings for the holding of a convention), which would exist otherwise, *i. e.,* unless *prohibited* by the constitution; and the two powers are entirely consistent with each other. To our minds it is clearly beside the point to say, as the court does, that "it is impossible to make an amendment to the Constitution in the manner prescribed and at the same time to make it in a different manner." We cannot see that "at the same time" has anything to do with the case, and even *at the same time* the general assembly could consistently pass a resolution for proposing a special amendment to be submitted to the people and pass an act or resolution with regard to a convention to consider a general revision of the constitution.

In our judgment the opinion in *State* v. *Kane, supra,* greatly lessened rather than increased the weight to be given to the advisory opinion, by exposing the fallaciousness of the reasoning in the earlier opinion.

*Higgins* v. *Tax Assessors of Pawtucket*, 27 R. I. 401, (1905), is also cited in the same brief in support of the advisory opinion, but in our judgment the opinion in that case also lessened rather than increased the weight to be given to the advisory opinion. Section 1 of Article XII of amendments to the constitution, adopted in 1903, provides, among other things, that the supreme court "shall have power to issue prerogative writs" and that "the inferior courts shall have such jurisdiction as may, from time to time, be prescribed by law." The question was whether, under the maxim above referred to, the provision granting to the supreme court jurisdiction to issue prerogative writs operated by implication to withhold this jurisdiction from the inferior courts. The court answered the question in the negative, rightly holding that the maxim was not applicable to the case. In support of this holding it quoted with approval the following from the opinion in *Delafield* v. *State of Illinois*, 2 Hill, 159 at 167; "As a grant of jurisdiction is not in its own nature exclusive, it can only be made so either by express words or by necessary implication." To us this language seems just as · applicable to a constitutional provision vesting in a legislature a permissive power, with only the *method* of its exercise made mandatory.

Yet the court in the *Higgins* case says: "The maxim. is undoubtedly a sound rule of construction in cases where it is applicable. Thus it was invoked by the justices of this court in their opinion given to the senate, *In Re The Constitutional Convention*, 14 R. I. 649, which is cited by the respondent. There it was held that the specified method of amending the constitution was the only lawful method; and it is difficult to imagine a reason for selecting one method out of several possible ones if all the others were still to remain legal and available." This is not convincing. At the time when the constitution was adopted there were only two methods of changing a constitution which were recognized as possible, one the convention method with legislative concurrence and ratification by the people, and

the other the legislative proposal method with ratification by the people. The former of these was recognized as legal unless *forbidden* by the constitution, while the latter was regarded as legal only when expressly *authorized* by the constitution. Therefore, if the makers of our constitution wished to make available the simpler and cheaper legislative proposal method, as an additional one, suitable for specific amendments, we do not find it "difficult to imagine a reason" for putting in a special provision for that method without putting in any express *and unnecessary* provision for the convention method, which alone is suitable for a general revision.

Many cases outside of Rhode Island have been cited for and against the advisory opinion of our judges. All the most important of these will now be discussed.

*Wells* v. *Bain*, 75 Pa. St. 39, (1874), was decided under the constitution of 1838, which contained a provision like our Article XIII and no provisions for a convention. The "Declaration of Rights" affirmed the "inalienable and indefeasible right" of the people "to alter, reform, or abolish their government in such manner as they may think proper." Yet a convention was called in 1873, pursuant to a legislative act, which was passed after a favorable vote of the people; and the new constitution framed and proposed by the convention was afterwards adopted by the people and went into operation. The act which called the convention provided that "the election to decide for or against the adoption of the new constitution or specific amendments shall be conducted as the general elections are now by law conducted." The convention passed an ordinance for submitting the new constitution to the people, which provided for a different manner of holding the election. The suit was brought to enjoin the holding of the election in Philadelphia in this manner.

The court held that the injunction should be issued on the ground that the act was valid and controlled the manner of holding the election and that any other manner would be

revolutionary in its nature. It discussed fully the whole matter of changing the constitution by the convention method and approved it as a proper method of making effectual the right of the people set forth in the declaration of rights. The court said at page 47: "The words 'in such manner as they may think proper,' in the declaration of rights, embrace but three known recognized modes by which the whole people, the state, can give their consent to an alteration of an existing lawful frame of government, *viz.*:

"1. The mode provided in the existing constitution.

"2. A law, as the instrumental process of raising the body for revision and conveying to it the powers of the people.

"3. A revolution:

"The first two are peaceful means through which the consent of the people to alteration is obtained, and by which the existing government consents to be displaced without revolution. The government gives its consent, either by pursuing the mode provided in the constitution, or by passing a law to call a convention. If consent be not so given by the existing government the remedy of the people is in the third mode—revolution.

"When a law becomes the instrumental process of amendment, it is not because the legislature possesses any nherent power to change the existing constitution through a convention, but because it is the only means through which an authorized consent of the whole people, the entire state, can be lawfully obtained in a state of peace. Irregular action, whereby a certain number of the people *assume* to act for the whole, is evidently revolutionary." This applies fully to our own situation, except that, as set forth in this opinion, *supra*, our constitution by section 10 of Article IV clearly authorized the general assembly to exercise the power, which it had frequently exercised previously, to

provide for the calling of a constitutional convention. We do not see how this approval by the supreme court of Pennsylvania of the convention method of changing the constitution, although the constitution only provided for the legislative proposal method, can properly be called a *dictum*, since the court gave this approval as its reason for granting the injunction and not the reason that the convention was an illegal and revolutionary body. Nor do we see how the opinion in that case can be reconciled with that of our judges by reason of the different language of the declarations of rights in the two constitutions, since, if the Pennsylvania constitution, by providing only for the method of legislative proposal, had prohibited the convention method of changing the constitution, the latter method would have been as clearly revolutionary and invalid under the Pennsylvania declaration of rights as under our own.

The question of the validity of the convention method in Pennsylvania was squarely raised and decided in the case of *Woods's Appeal*, 75 Pa. St. 59, (1874), in which citizens and taxpayers sought an injunction against the secretary of the commonwealth and other officers to prevent them from taking the necessary action for holding an election on the question of the adoption of the new constitution in accordance with the same "ordinance" of the convention which is mentioned in the above discussion of *Wells* v. *Bain*, *supra*. The first ground urged in favor of the injunction was "that the act was unconstitutional and repugnant to the tenth article of the constitution," which provided for the making of amendments to the constitution by the legislative proposal method, no other method being provided for. The bill prayed that both that act and the prior act by which the question of holding a convention had been submitted to the people be declared unconstitutional and void. The case was heard on demurrer to the bill.

It was heard first in the court of common pleas of Allegheny county before Stowe, J., and he sustained the validity of the acts in question and denied the injunction.

In his opinion he says, at page 63, that it is first "necessary to examine whether there is anything in the constitution, as urged in the second proposition, which directly or by necessary legal implication takes away such a fundamental right as we have suggested, in case it existed, where there is no constitutional restriction." He then continues as follows: "It is urged, and with much apparent force, that because the constitution in the tenth article 'of amendments' provides a certain and carefully-defined way for amending the fundamental law, the well-recognized legal maxim ordinarily applied to the construction of deeds and written instruments, as well as acts of legislation, '*Expressio unius est exclusio alterius*', leads to the fixed legal presumption that no amendment can, under the constitution, be made to it, except in the way thus especially provided.

"Custom and usage have also been allowed to aid in interpreting Acts of Parliament, 'and that exposition,' says Lord Coke, 'shall be preferred which is applied by constant use and experience.' It is by no means certain that the maxim alluded to should find any favor as a general rule of interpretation of an instrument like a constitution, which must of necessity deal in generalities; but at all events, if so applied, it must in all such cases be considered as overcome by any established or common usage or understanding, indicating a different conclusion."

He then sets forth what Jameson said, "with great force," upon this question, cites *Barto* v. *Himrod, supra*, mentions the opinion of the justices in Massachusetts and the convention held in that state in 1853, and mentions twenty-five conventions which had been "called by the legislatures of the various states, without any special authorization in their constitutions." He then says, at page 65, "The conclusion that I have drawn from all this is, that there is underlying our whole system of American government a principle of acknowledged right in the people to change their constitutions, *except where especially prohibited in a constitution itself*, in all cases and

at all times, whether there is a way provided in their constitution or not, by the interposition of the legislature, and the calling of a convention, as was done in the case in hand." At page 66 he adds: "It follows then, that the action of the legislature in authorizing a vote of the people on the question of the amendment of their constitution, and subsequently by another act authorizing the election of delegates, was a legal exercise of legislative power, and constitutional, unless something in the acts themselves is in conflict with some constitutional provision."

On appeal to the supreme court, that court in its opinion first said: "The change made by the people in their political institutions, by the adoption of the proposed Constitution since this decree, forbids an inquiry into the merits of this case. The question is no longer judicial, but in affirming the decree we must not seem to sanction any doctrine in the opinion, dangerous to the liberties of the people. The claim of absolute sovereignty in the convention, apparently sustained in the opinion, is of such magnitude and overwhelming importance to the people themselves, it cannot be passed unnoticed."

The supreme court found no fault with the reasoning and conclusion of the lower court on the matter of the validity of the convention. Indeed it said at page 72: "The calling of a convention, and regulating its action by law, is not forbidden in the constitution. It is a conceded *manner*, through which the people may exercise the right reserved in the bill of rights. It falls, therefore, within the protection of the bill of rights as a very manner in which the people may proceed to amend their constitution, and delegate the only powers they intend to confer, and as the means whereby they may, by limitation, defend themselves against those who are called in to exercise their powers The legislature may not confer powers by law inconsistent with the rights, safety and liberties of the people, because no consent to do this can be implied, but they may pass limitations in favor of the essential rights of the people. The right of the people

to restrain their delegates by *law* cannot be denied, unless the power to call a convention by law, and the right of self-protection, be also denied. It is, therefore, the right of the people and not of the legislature to be put by law above the convention, and to require the delegates to submit their work for ratification or disapproval. . . . To estop them from their right to accept or reject the work of the convention, there must be an evident channel pointed out through which their power passed to the convention to ordain at pleasure a constitution or binding ordinances."

The court then, after considerable discussion of the matter, says at the end of its opinion: "In conclusion, we find nothing in the Bill of Rights, in the vote under the Act of 1871, or the authority conferred in the Act of 1872, nothing in the nature of delegated power, or in the constitution of the convention itself, which can justify an assumption that a convention so called, constituted, organized and limited, can take from the people their sovereign right to ratify or reject a constitution or ordinance framed by it, or can infuse present life and vigor into its work before its adoption by the people."

With this last point we are not now concerned, but on the point now under consideration in this present opinion the court seems clearly to have approved the opinion of the lower court.

In *Collier* v. *Frierson*, 24 Ala. 100, (1854), the statement which is of interest to us is only a *dictum*, as the question at issue was whether under the constitutional provision for amendment by the process of legislative proposal and submission to the people, an amendment could be validly adopted without complying fully with such provision, and the court held that it could not. The declaration of rights affirmed the right of the people to alter the government in such manner as they may think expedient and there was no reference in the constitution to a convention.

The provision in the declaration of rights was perhaps somewhat more sweeping as to the manner of making

alterations than the corresponding one in our constitution, but the same reasoning, if sound, could have been applied as was applied by our judges, namely, that the people, by providing in the constitution for its amendment by legislative proposal and saying nothing about a convention, had limited themselves to the former method as the only manner to be followed in making constitutional changes. Yet the court in the Alabama case on pages 108 and 109 says: "The constitution can be amended in but two ways, either by the people, who originally framed it, or in the mode prescribed by the instrument itself. . . . We entertain no doubt, that, to change the constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself, must be observed, and the omission of any one is fatal to the amendment."

This language was quoted at page 620 in the opinion in the case of *Koehler & Lange* v. *Hill*, 60 Ia., 543 (1883), in which precisely the same issue was involved as in the Alabama case, and that issue only, and was decided in the same way. In one of the two briefs which were submitted to us by counsel who were delegated by the Rhode Island Bar Association to prepare and submit briefs on this matter, being the one in opposition to any power in the general assembly to provide for calling a convention, that case is cited as supporting the soundness of the Rhode Island opinion. The constitution of Iowa as in effect at the time of this opinion, and down at least to 1917, is shown in "The State Constitutions" by Kettleborough. Section 2 of Article I was as follows: "All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require it." It contained provisions for both methods of changing it, the method by legislative proposal being substantially the same as ours except that only a majority vote was required for adoption.

It was claimed by those who were trying to sustain the amendment, the validity of which was in question, that it had been proposed to the people in accordance with that method and adopted by vote of the people. The court held it invalid solely on the ground that according to the legislative records the proposed amendment as acted on by the second legislature and submitted to the people differed in a small but material respect from the form in which it was passed by the first legislature.

We do not find anything in the long opinions in that case which supports the advisory opinion of our judges. Indeed the court by its quotations from the opinions in *Wells* v. *Bain, supra*, and *Collier* v. *Frierson, supra*, seems clearly to recognize the validity of changes made by the convention method with the concurrence of the legislature, even under a constitution which did not provide for that method and did provide for the legislative proposal method.

Of the other cases outside of Rhode Island which are cited as supporting the advisory opinion of our judges *State* v. *McBride*, 4 Mo. 303, (1836), and *State* v. *Tufly*, 19 Nev. 391, (1887), simply decide, as did *Collier* v. *Frierson, supra*, and *Koehler & Lange* v. *Hill, supra*, that, if an amendment is attempted by the legislative proposal method under the constitution, the provisions made by the constitution for that method must be strictly followed or else the amendment is not valid even though ratified by a majority vote of the people. These cases do not even contain any *dicta* in support of the opinion of our judges, and *State* v. *Tufly, supra*, contains *dicta* to the contrary. In the special brief above mentioned the court in the latter case is quoted as saying: "We conclude that amendments to the constitution can be made only in the mode provided by the instrument itself." But the Nevada constitution, which it was referring to, was like the one in the Iowa case in that it had an express provision for the convention method as well as one for the legislative proposal method.

Another case similarly cited is *State* v. *City of New Orleans*, 163 La. 777, (1927). It is true that the court said at page 783: "The Constitution, by section 1, article 21, expressly points out when and how amendments to the Constitution may be proposed and considered by the Legislature, and adopted by a vote of the people, when so submitted. The manner of proposing and adopting amendments to the Constitution as thus provided is exclusive. The Constitution cannot be altered, changed, affected, or amended in any other manner, unless express and direct permission is given to the Legislature by the Constitution itself." But the court had said that the legislative act, which was in question and did not concern a convention and was declared void, was in its terms contrary to the constitution; was not a constitutional amendment; did not purport to be other than an act of the legislature; and did not pretend to amend any article of the constitution. The statement above quoted then was not at all necessary to the decision of the case and all that the court said as to how the constitution may be altered was the statement above quoted, which was not supported by any reasoning or citation of authority.

It is entitled to very little, if any, weight, especially in view of what the same court said directly to the contrary in the earlier case of *State* v. *American Sugar Refining Co.*, 137 La. 407, (1915). There the validity and regularity of the constitution of 1913, framed and adopted by the convention method, were squarely sustained by the court, although all the proceedings involved took place while the constitution of 1898 was in force, which provided for the legislative proposal method of amending the constitution and contained no reference to constitutional conventions. The court, at page 414, says that this silence of the organic law on the subject of conventions "leaves the question of calling such convention to the representatives of the people in legislative session convened," citing in support of this Cooley on Const. Lim., 7th ed. 56, now 8th ed. 81. We do not

believe that the court in 1927, by the language above quoted from its opinion, intended to overrule its decision in 1915. It is more likely that it was not thinking at all about the convention method of altering the constitution.

Supporters of the opinion of our judges have quoted to us another statement from Judge COOLEY's work, where, after speaking of the power of the people "to control and alter at will the law which they have made," he says at page 84: "But the will of the people to this end can only be expressed in the legitimate modes by which such a body politic can act, and which must either be prescribed by the Constitution whose revision or amendment is sought, or by an act of the legislative department of the State, which alone would be authorized to speak for the people upon this subject, and to point out a mode for the expression of their will in the absence of any provision for amendment or revision contained in the Constitution itself." This is a perfectly correct statement, that if a constitution is silent on the subject of its own alteration, the legislature and only the legislature is authorized to provide an explicit and authentic mode for ascertaining and effectuating the will of the people on this subject, i. e., by the convention method.

What is done by those who rely on the above quotation as supporting the advisory opinion is to construe it as equivalent to the converse of the statement, i. e., as saying that if the constitution does make any provision with regard to its own amendment or alteration, the legislature is thus deprived of the above described authority which otherwise it *alone* would have. Judge COOLEY does not make that converse statement anywhere and in thus construing his language those who thus cite it are making the same mistake as our judges made in construing Article XIII of our constitution. In a footnote to the above quotation he quotes from Jameson's work a long passage, which ends with this sentence: "Nor is it true . . . that the giving to the legislature, in a constitution, express power to recommend specific amendments to that instrument involves, by

inplication, the denial to that body of power to call conventions for a general revision." Moreover, Jameson in other places in his work clearly and strongly rejects the reasoning of our judges and sustains the above-mentioned authority of a legislature, except so far as clearly and definitely taken away or limited by the constitution, and Cooley, about a half page further in his discussion of this general subject, says, with regard to this work by Jameson: "This work is so complete and satisfactory in its treatment of the general subject as to leave little to be said by anyone who shall afterwards attempt to cover the same."

After discussing other questions as to the changing of constitutions, Jameson at page 601 puts this question, "When the Constitution makes no provision, then, for amendments, save in the legislative mode, can a Convention be lawfully called?" He refers to numerous instances in which conventions have been called under these circumstances and discusses the question on principle. Then he discusses the Massachusetts and Rhode Island advisory opinions and some of the cases already discussed in this present opinion and the maxim above referred to and says at page 610: "Obviously, as we have before remarked, while it may, without absurdity, be claimed that the maxim operates to prohibit the doing of the *same* thing in a different way from that prescribed by law, it cannot be claimed to prohibit the doing of a *different* thing in a different way. Now, it is very clear on the face of the constitutional provisions authorizing amendments through the agency of the legislature, as compared with those authorizing the call of Conventions, that the purpose of the former is different from that of the latter; in other words, the thing authorized to be done by the one class of provisions is a different thing from that authorized to be done by the other. Thus, the purpose of the legislative mode is to bring about amendments which are few and simple and independent; and on the other hand, that of the mode through Conventions is to revise the entire Constitution, with a view to propose either

a new one, or, as the greater includes the less, to propose specific and particular amendments to it. Where a few particular amendments only are desired, if the Constitution provides for both modes, the legislative mode should be employed; but if a revision is or may be desired, the mode by a Convention only is appropriate, or, as we expect to show, permissible. . . . To say, then, that the purpose of the two modes is the same, is to say that a part is equal to, or the same as the whole."

At page 615 he says: "Recurring, then, to the question whether, where a Constitution contains no provision for amendments save in the legislative mode, a Convention can be called, the answer must be, both upon principle and upon precedent, that a Convention can be called, certainly when a revision of the whole Constitution is desired, to determine what amendments, if any, are needed, or, if deemed advisable, to frame a new Constitution. In general, whenever a Convention is called, the intention is to authorize a revision of the entire Constitution, though, upon its meeting, the result of its labors may be only to recommend specific amendments. But, where the legislative mode is adopted, it is never intended to do more than to formulate certain specific amendments, though, in one or two cases where constitutional commissions have been employed, attempts have been made to adapt the legislative mode to the making of general revisions,—attempts which have not met with such success as to justify their repetition."

At page 44 Dodd, in his work above quoted from says: "It has now become the established rule that where the constitution contains no provision for the calling of a convention, but has no provision expressly confining amendment to a particular method, the legislature may provide by law for the calling of a convention—that is, the enactment of such a law is within the power of the legislature unless expressly forbidden, and is considered a regular exercise of legislative power."

Hoar, pp. 52, 56, 57, takes a somewhat different view from that of the text writers just quoted as to the basic principles involved, being of the opinion that usually the holding of a convention is a proceeding over and beyond the constitutions rather than under it, but arrives at substantially the same result.

It should be noticed that there is no need in this state of deciding between these points of view as to the theory of the matter, since it is clear, as we have above stated, that the general assembly has the power *under our constitution*, by section 10 of Article IV, to initiate a convention, unless prohibited by the constitution itself. Therefore, since in our opinion this power is not prohibited, a convention thus initiated, chosen and held would be constitutionally as well as legally held.

Holcombe, *supra*, in what we believe to be the latest book which deals with the question (1926), says at page 96: "The question therefore arises, what is the status of the constitutional convention in those states where its existence is not expressly recognized in the written constitution? Such states might logically be divided into two classes, those in which no express provision for amendment is contained in the written constitution, and those in which some provision is made for amendment through the agency of the ordinary legislature." After discussing the first class and concluding that in them the legislatures have been authorized by the unwritten law of their constitutions to start the machinery of constitutional revision by means of special conventions, he then discusses the second class of states and the advisory opinions in Massachusetts and Rhode Island. After saying, as quoted *supra*, that the former opinion related to another matter and that in no state has the latter opinion been followed, he adds at page 97: "On the contrary, the practice of the other eleven states has been based on the recognition of the right of the people through their representatives to provide by law for the calling of a convention. This right is construed from

the fact that the people undoubtedly possessed the right in the beginning, and have not parted with it by expressly confining amendment to some other method."

Other cases, not already cited, strongly support this view. *State* v. *Dahl*, 6 N. D. 81, (1896); *State* v. *Powell*, 77 Miss. 543, (1900), *semble; Ellingham* v. *Dye*, 178 Ind. 336, (1912), *semble; Bennett* v. *Jackson*, 186 Ind. 533, (1917), *semble.*

In *Ellingham* v. *Dye, supra,* the court held that a legislature, authorized by the constitution to proceed by the legislative proposal method, could not, under the guise of amending the constitution, frame a new constitution and submit it to the people for adoption; and the court enjoined the submission of the new constitution  It discussed thoroughly the entire matter of changing a constitution by the two methods, and by way of *dictum* agreed fully with Jameson's view that, when only the legislative proposal method was provided for in the constitution but the convention method was not clearly forbidden, the legislature could legally initiate the convention method.

In *Bennett* v. *Jackson, supra,* the court, acting under the same constitution as in *Ellingham* v. *Dye,* which provided for the legislative proposal method, but made no provision as to a constitutional convention, says at page 538:   "That the people of the State have a right to create a new constitution is conceded by all parties, the only  difference of opinion being as to the manner of bringing about that result," *i. e.,* as to whether the legislature must first obtain at an election the approval of the people for the holding of a convention.

As a result of our examination of all the cases and text books on the subject, which are known to us and to which we have had access, we are convinced that the authority in support of the advisory opinion of our judges is practically negligible and that the weight of authority in opposition to it is overwhelming.   We are convinced that the opinion is also against sound reasoning and principle.   Our con-

clusion is that it should be disregarded and that the convention method would be a proper and legal method of altering our constitution or framing and adopting a new one, even if the special provisions of our constitution, to which we called attention near the beginning of this opinion, were not present. And when we take into consideration the language quoted from our bill of rights and sections 1 and 10 of Article IV, that conclusion is in our judgment clear beyond a reasonable doubt. We therefore answer in the affirmative the first and primary question propounded to us.

We see no difficulty in subsidiary question (b) if it be understood that the governor is to act only upon instructions from the general assembly and in no sense to have delegated to him power which may be exercised only by the general assembly. To call for the convention is a function of the general assembly and cannot be left to the discretion of the governor. The legislature cannot delegate to the governor the absolute authority to fix the date of the convention election but it may authorize him to fix the date of the election within some definite period prescribed by the legislature itself. It is now well established that such limited delegation of legislative power is not within the scope of the rule that delegated power cannot be delegated. We therefore answer (b) in the affirmative, subject to our understanding of the question as here expressed.

This brings us to a consideration of subsidiary question (c). A constitutional convention is an assembly of the people themselves acting through their duly elected delegates. The delegates in such an assembly must therefore come from the people who choose them for this high purpose and this purpose alone. They cannot be imposed upon the convention by any other authority. Neither the legislature nor any other department of the government has the power to select delegates to such a convention. The delegates elected by and from the people, and only such delegates, may and of right have either a voice or a vote therein.

It will not, however, be contrary to this principle if the general assembly provides that the governor or some other person shall start the convention machinery by calling it to order and presiding temporarily until it shall choose its own president, which is the first business of the convention. Nothing should intervene until this is done as the convention is not organized as such until it has a directing head. Any departure from the regular order of business will be promotive of disorder. In this respect the convention should be vigilant to protect its integrity and its independence. No one, not a delegate, no matter how exalted his station in the existing government, can be assured either a voice or a vote in such a convention unless he comes there with a commission from the people as their delegate, although the convention itself may if it please invite him to address it or give it counsel, in which case he will be in the convention by invitation and not by virtue of his office.

We therefore answer question (c) in the negative.

Subsidiary question (d) must be answered differently according as the convention is called by the legislature alone or called by the legislature after an affirmative vote therefor on the part of the people. In the first instance the legislature summons the convention without permitting the people to limit the power of their delegates or to prescribe the manner in which they shall proceed to perform the task entrusted to them. Under such circumstances, to permit the general assembly to set bounds to the authority of the convention is to exalt the legislature, the agent, above its principal, the people. This cannot be. In such a case the general assembly is held to have summoned the people to sit, by their delegates, in convention untrammeled by rules or restraints of any kind that will interfere with the performance of its proper functions. This is the prevailing view of the authority of such conventions and appears to be the logical view.

In the second instance, the legislature summons the convention only after the people have expressed their will

to this effect. If, at the time the question of calling the convention is submitted to them, the people are informed of the scope of the convention and the manner in which it is to conduct its deliberations, and report its results by virtue of the act of the general assembly specifying such matters, then a convention called in this manner will be limited as therein set forth and the convention will then be bound to confine itself within the stated limits of the act of the assembly. The reason for this is that it is the people, under such circumstances, who prescribe the conditions in the legislative act by approving the call for the convention in accordance with the provisions of such act. The legislature merely proposes the conditions. It is the vote of the people for the convention that ratifies them and makes them binding upon the delegates. 6 R. C. L. § 18, p. 27. For this reason, in order that the delegates be so bound, it is necessary for the general assembly to propose the conditions before the election is held, and to take all necessary steps to bring them to the attention of the people seasonably before the time of voting at the election. This was done by the general assembly in 1853 when the people twice voted on such a call in this manner. We therefore answer question (d) in the affirmative if the question is submitted to the people and the act of the general assembly prescribing rules for organization and conduct of the convention is brought to their notice before voting on the question; otherwise our answer is in the negative.

Question (e) must be answered not only in the light of legislative precedents in this state but also with due regard to our answer to question (d). It would seem that if the general assembly calls the convention, then the convention, itself, may disregard any legislative directions for ratification of its work by the people and prescribe a method of its own. All the legislative precedents in this state, however, are in support of the view that the legislature can provide that the work of the convention shall be submitted to the people for ratification or rejection before going into effect. Whether

it is prescribed by the general assembly or the convention, in either case we think a reference to the people for their approval or disapproval is a necessary and final step without which the work of the convention is lacking legality. It seems to us that the better practice, and the one most likely to insure a final vote of the people on the convention's work would be for the general assembly to enact a law for this purpose. As the legislature under the existing government has the power over the purse strings and exercises the legislative authority to define offenses and prescribe their punishment, neither of which powers is inherent in a constitutional convention, it is clear to us that the legislature from a practical viewpoint is the only body that can order a referendum election and make provision for the necessary appropriations therefor, and prescribe the punishment for offenses that may be committed thereat. Without this an orderly election would be difficult, if not impossible. The work of the conventions of 1824, 1841 and 1842 were submitted to the people in accordance with acts of the assembly. Following these precedents and for the reasons above stated we answer the question in the affirmative.

We now come to the final question (f). If this question refers only to the matter of making a final count of the votes and officially reporting the result so that it may be duly registered and recorded as an authentic act of the people, we think for the reasons given in answer to question (e) that such act of the general assembly would be valid. If the question refers to the power of the general assembly to provide by law that the vote of a majority of the electors voting thereon shall be sufficient for ratification and adoption, our opinion, in view of the legislative precedents in this state, is that it has that power. Whether the exercise of it is subject to a power in the convention to require a larger majority is one which is not asked and which in the present state of the authorities we prefer not to answer. Of course if this question of the necessary majority is submitted to the people, their decision is final.

We have now given our opinions on all the questions which appear to have been clearly submitted to us or to be necessarily implied, and so far all the judges of the court are in agreement. But there is a further question which is at least closely related to the provision covered by sub-paragraph (a) and may have been intended to be included therein. This question is: granting that the general assembly has the general power to legislate with regard to the election by the people of a constitutional convention, as we have previously found, is that power subject to the condition that the people must consent at an election to the holding of such a convention? This has been discussed *pro* and *con* in briefs and arguments submitted to us and we therefore feel that we should express our opinion upon it.

The exact question whether or not that general power is, necessarily and as a matter affecting the essence of the power, restricted by the condition stated, unless the constitution provides otherwise, has been very little discussed in the cases or by the text writers. Nearly all of them do not deny the existence of the general and unlimited *power*, and discuss whether the exercise of it is in conformity with general usage and with sound policy under ordinary circumstances.

We have already seen that the majority of the court in *Bennett* v. *Jackson*, 186 Ind. 533, *supra*, stated that the legislature did not have the power to call a convention without the consent of the people, and *decided* that it had no such power when the people within about three years had voted against the calling of a convention. Their treatment of the question covered by their statement is of the sketchiest. After proposing it and saying that the right of the people in the matter of changing the constitution is supreme, subject, however, to the condition that the legislature must approve, they say: "How may these—the people and the legislature—get together on this proposition? If no positive rule is provided by the fundamental law of the State, then, if a custom has

prevailed for a sufficient length of years so that it is said to be fully established, that rule of custom must prevail.

"It seems to be an almost universal custom in all the states of the Union, where the constitution itself does not provide for the calling of a constitutional convention, to ascertain first the will of the people and procure from them a commission to call such a convention, before the legislature proceeds to do so. The people being the repository of the right to alter or reform its government, its will and wishes must be consulted before the legislature can proceed to call a convention. 6 R. C. L. § 17, p. 27; Hoar, Constitutional Conventions, p. 68, (1917). We find our own State, under the custom that has prevailed in other states, submitting to the people the question as to whether a convention should be called in the year 1915. (Acts 1913, ch. 304, p. 812.)" That is all they say on this point.

The statement as to the custom in other states is much too sweeping and we do not see how the custom in other states, a very large part of which was after the adoption of the existing Indiana constitution can have the effect of a constitutional provision in that state. It appears elsewhere in the opinion that the submission directed in 1913 was the only one in that state, at least since 1851; and neither of the citations supports in the slightest degree the vital sentence which the citations follow. On the other hand the dissenting judge in a long opinion on this one question beginning at page 541 discusses the matter fully. On pages 549 and 550 he cites many authorities which state that the enactment of a law for the calling of a convention is within the power of a legislature, unless expressly forbidden, and do not suggest any other limitation of that power.

At page 552 he says: "Reduced to its last analysis, it is clear that the only difference between the plan outlined by the court in its opinion and the plan embodied in the act of 1917 is one of method. The plan recognized by the court may be more wise, more economical, and more expedient

than that adopted by the legislature, and while such questions should be considered by the legislature before passing a law, they have no place here. When a court is engaged in considering the validity of a law from a constitutional standpoint it has no ears to hear arguments addressed to questions of wisdom, economy or expediency." At page 553 he cites twelve instances in which conventions were called by legislative action alone without a reference to the people, four of them from Rhode Island, and concludes that as to the method to be adopted by a legislature "it is controlled only by the existing constitution, and, so long as it does not violate the express or implied provisions of that instrument, it may adopt the method which seems most wise and expedient under existing conditions."

On pages 554 and 555 he ends as follows and with this, after most careful consideration, we fully agree: "One further question remains to be considered. Does the plan of procedure embodied in the act of 1917 conflict with § 1, Art. I, of the State Constitution, which reserves to the people the indefeasible right to alter and reform their government? Under the plan adopted, the people have a right, through delegates elected for that purpose, to frame the constitution which would contain such alterations and reformations in the form of government as seemed proper to the delegates and after the constitution was so framed the people by their vote would have a right to accept or reject the changes thus offered. To my mind the plan adopted by the act does not in any way or to any extent impair or abridge the rights of the people under this section of the Bill of Rights; but, on the other hand it provides a means by which the people may exercise their indefeasible right to alter and reform their government. . . . It may be and probably is true that, in view of the existing war conditions, this is an ill-chosen time to attempt constitutional revision. It may be true that the plan adopted by the legislature is unwise, in that it may occasion a useless expenditure of the people's money, if it should be ascertained

in the end that a new constitution is not desired, when that fact could have been learned in a manner much less expensive. If the question to be decided involved the wisdom of the plan adopted or its expediency, my conclusion might be against it on those grounds, but, as such considerations can have no place in determining the validity of the plan from a constitutional standpoint, I am forced to the conclusion that the plan for holding a constitutional convention embodied in the act of 1917 is unobjectionable when viewed from that standpoint." We may properly add to this that the question of the advisability of spending the money of a state for any purpose is peculiarly one for the legislature to decide, except so far as it may be controlled by some clear provision in the constitution.

It is easy to understand how the majority of the court in this Indiana case felt toward the legislative act which called a convention so soon after the people by a very large majority had refused to approve a call. But in our judgment they were wrong in allowing their natural indignation to lead them to lay down the rule of law which they did.

The main ground which they gave for their statement was that "The people being the repository of the right to alter or reform its government, its will and wishes must be consulted before the legislature can proceed to call a convention." This seems to us clearly a *non sequitur*, as the people do all the altering and reforming of their government, if they first, through delegates chosen by them for that purpose, frame and provisionally decide upon the changes to be made, if any, and then, at an election, finally decide to make them. It is settled that the people alone cannot, without revolutionary action, call a constitutional convention, unless the constitution provides the necessary machinery for that purpose, but the legislature must take the first step in starting the process of having the constitution re-examined, (which is the primary meaning of "revised"), by a convention chosen by the people, to see if in the sound judgment of the convention it ought to be altered and, if so, how.

This is so because, unless the constitution furnishes the necessary machinery for electing the delegates and so forth, the legislature alone can provide it.

If, after the legislature has decided that such a convention ought to be called for the purpose stated, it is essential to the legality of the call that the people vote in favor of it at an election, then that makes necessary *four* popular elections, before their power of alteration can be effective. That is, they must first elect a legislature that will pass the necessary legislation; second, they must vote in favor of a convention; third, they must elect delegates to a convention that after examining the constitution will frame and submit to the people the alteration desired; and finally at a fourth election the people must vote in favor of the alteration. The first, third and fourth of these elections are obviously necessary for legally altering the constitution by the convention method; and obviously again, the adoption by the people of the alteration recommended by the convention *ratifies all that has gone before,* according to all the authorities on the subject. The requirement of the second election clearly *impedes rather than facilitates* the exercise by the people of their power to control their governmental institutions.

It may perhaps be *wiser* that it be thus impeded, so as to make constitutional changes harder and slower to make, just as it may be argued that it would be wiser to make a three-fifths instead of a majority vote necessary for a legal alteration of the constitution, or to require, for adoption of any change, majority votes in two elections two years apart. But each of these ways of impeding the people in the exercise of their fundamental power is a matter of *policy* and the adoption of neither of them is necessary or even called for in order to make effective the exercise of that power. If the people deem it wise thus to impede the exercise of their own power, they may put a suitable provision into the constitution for that purpose. Or if the legislature deem it wise, it can decline to call a convention

unless the people at an election vote in favor of one. But in our judgment a *court* is going entirely outside of its proper functions to require that such an election be held, unless the constitution clearly requires it.

The opinion in *State* v. *Dahl, supra,* is sometimes cited as supporting the view that a legislature cannot legally call a convention without obtaining the consent of the people, but a careful examination of the opinion shows that the rule there stated is one purely of policy and not of law. The question at issue was whether the legislature had any power to submit the question to the people and the court holds that it had such power and says that in fact such submission is desirable. At page 85, it says: "Nor can it be said that it is an empty form to leave to popular vote the grave question whether the people shall assemble in convention, and revise their fundamental law."

We do not deny that this is a proper and may be a desirable method of procedure, but that is far from a statement that it is a *legally necessary* method. No such statement is made in the opinion, nor is one to be implied. In fact the court says at page 86, that "while the power resides in the legislature, and that body only, to call a constitutional convention, it is obvious that it . . . should not . . . burden the people with the expense of such a movement, without first submitting the question to them." This is clearly a *dictum* relating not to the *power* of the legislature, which is admitted, but only to what the court considers to be sound *policy* in exercising it. The *expense* is all that the court emphasizes, and as stated, *supra,* this is always a matter for a legislature to pass upon, except so far as restricted by the constitution.

The court refers to and quotes from a message sent in 1820 by the Council of Revision of New York to the legislature returning with its disapproval a bill which called a constitutional convention without referring the matter to the people. The council stated its objection to be that it was "the most wise and safe course and most accordant

with the performance of the great trust committed to the representative powers under the constitution" to submit to the people the question of holding a convention. This is clearly a matter of policy and not of power.

To be sure the message says that it "may well be doubted" whether it belongs to the ordinary legislature to call a constitutional convention without first obtaining permission from the people. But it did not discuss or decide this question of *power* and indeed it had no right to do so, as it was not a court, but only a special body vested with a veto power over such legislation, and it proceeded on the ground of what it considered sound policy.

We are aware of no other case which appears, even by way of *dictum*, to deny the power of the legislature, unless forbidden by the constitution, to call a convention without obtaining the consent of the people; nor have we found any text books on the general subject which deny that power, if not prohibited, though Hoar, at page 61, says that "there is some doubt as to whether the legislature can legally call a convention without obtaining the popular permission." There are many references to the general practice of submitting the matter to the people and to the fact that the great majority of state constitutions now require such a submission. But these considerations go to the point of policy and not to that of power and if there is any implication to be drawn from the latter of these facts, it is rather that the framers of these constitutions felt that it was necessary to require such submission in order to take away the power which the legislature would otherwise have to call a convention without obtaining the consent of the people.

On the other hand a good many conventions have been held which were called by the legislatures without the consent of the people and the results of whose work have been adopted by the people. We are not aware that the legitimacy of the constitutional changes thus made has ever been questioned. Jameson says at page 211: "It must be laid down as among the established prerogatives of

our General Assemblies, that, the Constitution being silent, whenever they deem it expedient, they may call Conventions to revise the fundamental law." Dodd says at page 46: "Then, too, when no provision is contained in a state constitution regarding the calling of a convention, it would seem to be within the discretion of the legislature as to whether the question should be submitted to the people." And as already quoted, *supra*, the court in *State* v. *American Sugar Refining Co.*, 137 La. 407, at 413, says that the silence of the organic law on the subject of conventions "leaves the question of calling such convention to the representatives of the people in legislative session convened." What the feeling or the general practice in this matter may have become since the adoption of a constitution may very properly influence the discretion of the legislature in exercising its power under that constitution, but it seems to us utterly irrelevant as to the extent of the power, which must depend upon what the constitution meant when it was adopted.

It is our conclusion, then, that outside of Rhode Island, in states in which a submission to the people of the question of calling a convention is not required by their constitutions, the legislatures have the power in their discretion to call conventions without such submission.

The reasons which have led us to this conclusion apply in full force in this state. Moreover, there are facts peculiar to this state which to our minds make the same conclusion here clear and inevitable.

In 1821 and again in 1822 the general assembly submitted to the electors, known as the "freemen," a request to express their "opinions" as to the "expediency" of calling a constitutional convention, evidently as an aid to the general assembly in deciding the question of whether or not to issue such a call. In neither case were the freemen given any power to decide that question. In each case the freemen returned a large majority of opinions against the expediency of such a call, there being in the latter case 843

for and 1804 against. Yet in 1824, less than two years after this second unfavorable reply from the freemen, the general assembly, without again consulting them, issued a call for a constitutional convention by requesting the freemen to choose delegates to such a convention, any constitution framed by the convention to be submitted to the freemen for ratification. The freemen chose delegates accordingly and the convention was held. It framed and submitted a constitution, which was rejected by the freemen.

Again in 1834 the general assembly issued a similar call, without consulting the freemen, and a convention was chosen and held, but no constitution was framed. In 1841 and again in 1842 similar calls were similarly issued, conventions were chosen and held, the constitution framed by the former convention being rejected and the one framed by the latter, our present constitution, being ratified.

In all these proceedings the general assembly kept in itself and exercised the power to decide whether or not to call a convention and whether or not, before doing so, to obtain the opinions of the voters as to its "expediency." Then, too, all of these proceedings must have been well known to the framers of our present constitution and the later of them, at least, must have been well known to those who voted for its ratification.

The next fact to be considered is that, as above stated, our constitution, as framed and ratified, provided and still provides, in section 10 of Article IV, that "The general assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution." This does not say "the legislative powers" but "the powers," and according to the clearly correct reasoning of Chief Justice AMES in the unanimous opinion of this court in Taylor v. Place, supra, as to the vesting of "the judicial power in the courts" by section 1 of Article X, "the powers" means all the powers. Section 10 of Article IV then clearly continued in the general assembly the

power to call upon the people to elect a constitutional convention, whenever it deemed it expedient to do so, without submitting to the people the question of such call, unless the exercise of this power was *"prohibited"* by the constitution.

As we have previously said in this opinion, this power cannot be held to be prohibited by anything short of an express prohibition or language which is equivalent to an express prohibition. We have stated *supra* that in our judgment Article XIII is not such a prohibition. The only other provision in our constitution on which any argument against this broad power can conceivably be based is the language above quoted from section 1 of Article I that "the basis of our political systems is the right of the people to make and alter their constitutions of government," the "paramount obligation" of which "in all legislative, judicial, and executive proceedings" we freely admit. But as we have previously shown herein, we cannot see that the submission by a legislature to the people of the preliminary question of whether a convention should be held is any necessary part of the exercise by the people of their fundamental right to make and alter their constitutions. Indeed we cannot see that it is any part at all of the making or altering of a constitution by the convention method. That is done by the free choice by the people of delegates to a convention, under legislative sanction, the framing by the convention of a new constitution or of the alteration to be made of an existing one, and the ratification by the people of the proposed constitution or alteration.

As above stated, it is clear to our minds that the requiring of any extra election by the people which is not a direct and necessary part of the making or altering of a constitution *impedes* rather than *facilitates* the exercise by the people of their fundamental right. Indeed so many elections might be required in a constitution for its alteration as to make any such alteration very difficult and to constitute a very serious impairment of the people's fundamental right. Moreover, those who do not assert the unrestricted power

of a legislature to call a convention recognize that at any rate the calling of a convention, which has not previously been approved by the people, is ratified if the people adopt the result of the convention's work. This clearly shows that there is really no inconsistency between the calling of a convention without first obtaining the express consent of the people and the fundamental right of the people to make and alter their constitutions.

It should also be kept in mind that, although prior to our present constitution there may have been in this state no constitutional declaration of the fundamental right of the people to make and alter their governmental institutions, yet that right was everywhere recognized after the Declaration of Independence, even in the states whose constitutions did not contain any such declaration. It was no doubt recognized in this state, and yet apparently no one asserted that it was inconsistent with that right of the people for the general assembly to call a constitutional convention without obtaining the consent of the people.

We cannot see that the fact that the general assembly in 1853 submitted to the people the question of the holding of a convention is of any importance whatever. As the general assembly could perfectly well have the discretionary power to call a convention either with or without the consent of the people, the fact that it chose to ask the consent of the people at that time does not at all tend to prove that it could not have validly called a convention without such consent if it had chosen to do so.

In view of all these considerations we cannot see that there is any such inconsistency between the fundamental right of the people to make and alter their constitutions, as set forth in our bill of rights, and the previously many times exercised power of our general assembly to call a convention, without submitting the question to the people, as would justify us in saying that that power of the general assembly is prohibited by our bill of rights. There is certainly no express prohibition and it is clear to us that

there is nothing which is substantially equivalent to an express prohibition. It is an entirely different case from that before this court in *Taylor* v. *Place, supra,* in which it was rightly held that, in view of other provisions in the constitution, the language of section 1 of Article X clearly meant that *all* the judicial power was vested in the courts and that this was equivalent to an express prohibition of the exercise of any of that power by the general assembly.

Our opinion is that the general assembly clearly has the *power* to pass a law calling a constitutional convention without obtaining the approval of the people for the calling of such convention, and that whether the *exercise* of that power at any particular time is advisable or proper is for the general assembly alone to decide, giving such weight as it may deem proper to the existing circumstances, to the usual but by no means universal custom of legislatures to ask such consent and to the fact that the great majority of constitutions now require it.

> EDMUND W. FLYNN,
> WILLIAM W. MOSS,
> ANTONIO A. CAPOTOSTO,
> FRANCIS B. CONDON.

BAKER J. dissenting in part.

Finding myself unable to agree in one respect with the views expressed in the opinion of the majority of the judges in response to the questions asked us, I deem it my duty to set out my position in connection therewith.

I am in general accord with the conclusion reached by the majority of the judges, and for the reasons expressed in their opinion, that a constitutional convention can be called under the constitution by the general assembly to revise that instrument. This is in answer to the first question asked which is marked (a) which reads as follows:

"Would it be a valid exercise of the legislative power if the General Assembly should provide by law,

(a) for a convention to be called to revise or amend the constitution of the state."

In one particular, however, I am unable to concur with the holding of the majority opinion, and that relates to the necessity of the submission to the people by the general assembly of the question of the calling of a constitutional convention before the general assembly actually proceeds to make the call.

Granting that a constitutional convention to frame a new constitution or generally revise the existing instrument may properly be held under the present constitution, it seems well settled that the legislature is the proper organ or body to initiate proceedings to bring such a convention into existence. The authorities are not uniform in construing the nature of the power employed in this connection. It would not seem to be the ordinary legislative power in its narrower sense. But whatever its nature, whether inherently legislative, or as being in the legislature as the agent of the sovereign people and the most suitable body to act as representing them, it is clear that the power exists in some form, and a discussion at length as to its scope would not be profitable.

A serious question is raised, however, as to what is the legitimate exercise of this power by the legislature in starting proceedings looking toward the calling of a constitutional convention.

There are two views. One is that the legislature has the power to call a constitutional convention without first submitting to the sovereign people the question as to whether they wish such a convention to be held; the other is that the power of the legislature in the first instance is limited to ascertaining from the people their desires in connection with the holding of a constitutional convention.

Very respectable authority is found supporting both positions. Those arguing for the first contention or the broad power claim that such power is inherent in the legislature, and that it is entirely a matter of policy or the exercise of a sound discretion as to whether the question should first be submitted to the people. Those taking the

second position urge that the submission of the question to the people is a necessary prerequisite to the proper exercise of the power of the legislature.

After giving this question careful consideration, I have come to the conclusion that the reasoning which supports the second of the above views, *viz;* that requiring submission to the people by the legislature of the question of calling a constitutional convention in order to get their approval before making the actual call, is the sounder, the more correct, and the more in accord with modern trends and developments in constitution making.

On this general proposition, without considering at this time conditions peculiar to this state, reference may be had to a few citations of authority. As early as 1820, Chancellor Kent of New York, in writing a report for the Council of Revision of that state, to whom had been submitted an act passed by both houses of the New York Legislature in connection with the calling of a constitutional convention, used the following language: "It is worthy, therefore, of great consideration, and may well be doubted, whether it belongs to the ordinary legislature, chosen only to make laws in pursuance of the provisions of the existing Constitution, to call a Convention in the first instance, to revise, alter, and perhaps remodel the whole fabric of the government, and before they have received a legitimate and full expression of the will of the people that such changes should be made." Jameson, Constitutional Conventions, 670.

There is, in another portion of the report, language which possibly implies that the question of submission might be one of policy. It is submitted, however, that the above quotation indicates that the writer's opinion was clearly against the exercise of the broad power by the legislature.

In Hoar on Constitutional Conventions at page 68 the following statement is found: "Thus convention-calling is not a regular function of the legislature, and there is a growing tendency toward the view that the legislature has

no power to call a convention without first obtaining permission from the people."

Dodd in The Revision and Amending of State Constitutions at page 51 says: "The practice of obtaining the popular approval for the calling of a convention may be said to have become almost the settled rule. Thirty-two state constitutions require such a popular expression of approval, and even where it has not been expressly required such a popular vote has been taken in a majority of cases in recent years." At page seventy-one he further says: "According to what is now the more usual procedure in the adoption of constitutions, there are three popular votes connected with the matter: (1) The vote of the people authorizing a convention. (2) The election by the people of delegates to the convention. (3) The submission to the people for approval of the constitution framed by the convention."

In the case of *State* v. *Dahl*, 6 N. D. 81, the court at page 85 used the following language: "Nor can it be said that it is an empty form to leave to popular vote the grave question whether the people shall assemble in convention, and revise their fundamental law."

While the decision of the court in this case was finally based on narrower grounds, nevertheless it seems clear from the language used in the opinion that the court stands for the general principle of submission.

In the case of *Bennett* v. *Jackson*, 186 Ind. 533, a comparatively recent authority, the following view is approved by the court at page 539: "It seems to be an almost universal custom in all of the states of the Union, where the constitution itself does not provide for the calling of a constitutional convention, to ascertain first the will of the people and procure from them a commission to call such a convention, before the legislature proceeds to do so. The people being the repository of the right to alter or reform its government, its will and wishes must be consulted before the legislature can proceed to call a convention." In this

case there was a dissenting opinion which is approved and discussed at length by the other members of this court.

Finally, it is noticeable that in the various state constitutions expressly permitting the calling of constitutional conventions (the number of such constitutions being well over thirty) in all but a very few the provision is contained that the question be submitted to the people for their approval before the convention is called. This state of facts reveals clearly the present trend and development in constitutional law on this point.

The question is next presented as to whether anything in our own constitution or our historical background prevents the application of the general principles above set out to the issue now before us. It is probable that the language of section 10 of Article IV of our constitution, having in mind our constitutional history, presents the strongest argument for the holding that the legislature has the power to call a constitutional convention without first submitting to the people the question of whether they wish one called. In this connection the conclusion of the majority of the judges is based to some extent on said section 10 of Article IV. This section reads as follows: "The general assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution."

After the Revolution and prior to the taking effect of the present constitution in 1843, the state was still under the Royal Charter granted in 1663, slightly modified. This charter could hardly be termed a constitution, but it represented the fundamental law of the state. Under it the general assembly had extremely wide powers. In the early years of the nineteenth century that body made use of both methods of calling constitutional conventions. In 1821 and in 1822 questions were submitted to the people as to the expediency of calling a constitutional convention and both times the vote was in the negative. In 1824, 1834, 1841 and 1842, the general assembly proceeded ·to call conventions without first asking the approval of the

people. It is clear therefore that prior to 1843 the general assembly, whether rightly or wrongly, exercised the power of calling constitutional conventions directly.

Apparently, therefore, the next point for consideration is whether, in the legislative grant given the general assembly in section 10, Article IV, under the present constitution, this power was continued on to the general assembly, or whether its exercise is prohibited by any other part of the constitution.

It would seem that the only portion of the present constitution which could act as a check, limitation or prohibition on any powers granted under Article IV, section 10 in this connection would be Article I, section 1. This whole section together with its preamble must be read and construed together. It is set out fully in the majority opinion. It constitutes a part of the bill of rights in the constitution. By its terms the sovereign people expressly reserved for themselves, as a matter of fundamental law, when they voted to accept the present constitution, the right to make and alter their constitutions of government. In the preamble it is declared that the "essential and unquestionable rights and principles hereinafter mentioned shall be established, maintained, and preserved, and shall be of paramount obligation in all legislative . . . proceedings."

It is largely from this general reservation of power that we find the authority to hold a convention at all under the constitution, the latter being otherwise silent on the matter of calling a convention. The language of section 1, Article I and its preamble should be broadly construed. The intent is clear to reserve in the sovereign people all powers in connection with altering and making their fundamental law, except what is granted to the legislature under Article XIII relating to amendments. The language and intent of the reservation seems wide enough to require that the sovereign people be consulted and their favorable opinion obtained before the legislature proceeds to call a constitutional

convention. The people should be entitled to a participation in all the incidents and steps connected with the proceedings instituted to set up a constitutional convention, which are included in the full exercise of the right to make and alter their constitutions of government.

In my opinion it does not meet the entire requirements of section 1, Article I and its preamble, to say that the people may vote for delegates to a convention, and that such convention will be obliged to submit its work to the people for approval or disapproval. Under the express reservation of rights in section 1, Article I, they are entitled to be consulted in the beginning as to whether or not they desire a constitutional convention called to alter or revise their constitution. It seems reasonable to hold, therefore, that section 1, Article I and its preamble act as a prohibition to the exercise of any power by the general assembly under section 10, Article IV to call a constitutional convention directly without first ascertaining the will of the people.

Section 10, Article IV of the constitution has been discussed by this court several times. One of the first occasions was in the well known opinion by AMES, C. J., in *Taylor* v. *Place*, 4 R. I. 324. There it was forcefully held that an affirmative grant in the constitution of the judicial power to the courts operated as a necessary prohibition on the exercise of any judicial power by the general assembly under said section 10, Article IV. This opinion of *Taylor* v. *Place, supra,* was later referred to in the case of *Higgins* v. *Tax Assessors of Pawtucket,* 27 R. I. 405, where the court said "and therefore the affirmative words of the constitution granting judicial power to the Supreme Court and such other courts as the General Assembly should establish were construed as taking away such power from the General Assembly."

On the issue now presented to us for consideration, while perhaps the line of demarcation is not so distinct, nevertheless the same general reasoning would apply. Here instead of an affirmative grant of the judicial power, as in

section 1, Article X, we have in section 1, Article I a very clear, positive, and express reservation in the sovereign people of the right to make and alter their constitutions of government, which right is to be of paramount obligation in all legislative proceedings, and which right, as we have seen, may be exercised by means of a constitutional convention.

If the former is held to be a necessary prohibition as applied to the exercise of any judicial power passing to the general assembly under section 10, Article IV, it is difficult to see why, in the present inquiry, the latter reasonably may not be construed as a prohibition to the use of any power by the general assembly in calling a convention without first ascertaining from the people if one is desired.

In the case of the *City of Providence* v. *Moulton,* 52 R. I. 236, the court discusses at length the theory of local self-government in its relation to the powers given the general assembly under section 10, Article IV. In holding that the general assembly has very broad powers, the following language is used at page 243: "The above references show that under the charter the general assembly had unlimited power and authority restricted only by the constitution of the United States. Cities and towns had no powers of local self-government under the charter, and none were reserved to them by the constitution adopted in 1842." The cases of *City of Newport* v. *Horton,* 22 R. I. 196 and *Horton* v. *City of Newport,* 27 R. I. 283 are cited with approval.

However, the situation presented in the *Moulton* and *Horton* cases *supra,* and that now being considered seem plainly distinguishable. It is clear that no powers were reserved to the towns by the present constitution adopted in 1842, whereas in section 1, Article I there is an unequivocal reservation of right in the sovereign people to make and alter their constitutions of government.

If historical precedents are of any value, we find that twice in 1853 the general assembly submitted to the people

the question of whether a constitutional convention should be called. This action was ten years after the present constitution went into effect and, while not conclusive, would seem to have some value as an example of more or less contemporaneous construction.

Under the present constitution, no general assembly as yet has ever issued a direct call for a constitutional convention. Possibly the decision of the judges in 1883 may have had a bearing on this state of facts, but nevertheless the usage and custom which developed have some force as a legislative precedent. This court said in an *Advisory Opinion of the Justices*, 3 R. I. at page 308, (1854), speaking of the exercise of judicial power by the general assembly: "If the practice of the General Assembly, down to the adoption of the Constitution, had been to exercise such a jurisdiction, and such practice has been discontinued since, it is fair to presume it was discontinued because inconsistent with that instrument."

It is hard to perceive why the same argument on the existing facts cannot be made in connection with the exercise of the power to call constitutional conventions without first submitting the question to the people to find out their will.

In view of the above considerations, it is my opinion that the right reserved to the sovereign people in section 1 of Article I of the constitution operates as a prohibition to the exercise by the general assembly of the power to call directly a constitutional convention under section 10 of Article IV of the constitution, and that there is, therefore, nothing in our existing constitution which prevents the application of what seems to be the sounder principle of the law relating to the calling of constitutional conventions by the legislature.

I therefore answer the question marked (a) in the affirmative, provided that the general assembly has, as a necessary prerequisite, first submitted to the people for their approval or disapproval the question of the calling of the convention.

If the sovereign people approve, by a majority of those voting, then the general assembly can proceed to make the call, otherwise not.

If a question should be submitted to the people it would appear that its form is largely discretionary with the general assembly. The question might be merely the simple one as to whether a constitutional convention should be held; or it might be fuller and broader, setting out in some detail the type and scope of the convention proposed to be called. If the latter form of question is made use of, then the general assembly and the convention would be bound, in case of an affirmative vote by the people, to the type and scope of convention referred to in the question.

Assuming a convention called after a vote of approval by the people, then I concur in the answers given in the opinion of the majority of the judges, and for the reasons set out therein, to the subsidiary questions marked (b), (c), (d), (e), (f).

HUGH B. BAKER.

*John P. Hartigan, Attorney General, and John J. Cooney, Asst. Attorney General,* at the instance of His Excellency Theodore Francis Green, Governor.

*Patrick H. Quinn, and William A. Graham,* at the instance of the Rhode Island Bar Association, with *Michael De Ciantis* on the brief.

*Thomas J. Flynn, with James W. Leighton,* on the brief, for Hon. Robert E. Quinn, Lieutenant Governor.

*James T. Greene.*

*Thomas F. Cooney.*

*George Ajootian* for negative answer to (C).

*Edgar V. F. McCrillis.*

*Elmer S. Chace and Frederick W. Tillinghast,* at the instance of the Rhode Island Bar Association.

*Russell W. Richmond.*

*Herbert M. Sherwood,* in behalf of: Richard S. Aldrich, Henry M. Boss, Jr., Westcote H. Chesebrough, Sidney Clifford, James C. Collins, Harry Parsons Cross, Walter Curry, Edward L. Godfrey, William B. Greenough, William R. Harvey, James A. Higgins, Louis V. Jackvony, Francis B. Keeney, Edmund J. Kelly, Clifford A. Kingsley, James B. Littlefield, Edward F. Lovejoy, Richard E. Lyman, Archibald C. Matteson, Benjamin M. McLyman, E. Butler Moulton, William A. Peckham, Fred B. Perkins, William P. Sheffield, Charles P. Sisson, Harold E. Staples, Rush Sturges, Walter I. Sundlun, Harold B. Tanner, Frank W. Tillinghast, Everett M. Walling, Clarence N. Woolley, *amici curiae.*

*Zechariah Chafee* filed a brief.